[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 5, 2008
THOMAS K. KAHN
CLERK

No.  06-11643
_____

D.C. Docket No. 04-00329 CR-01-JTC-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHARLES E. EDWARDS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(May 5, 2008)**

Before TJOFLAT, BLACK and EBEL[*], Circuit Judges.

_____

[*]  The Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

This case involves a business that the defendant, Charles E. Edwards, claimed was legitimate. A Northern District of Georgia jury, however, found that Edwards was operating a Ponzi scheme and convicted him of wire fraud and related crimes.[1] Edwards now appeals his convictions and the prison sentence he received. We affirm his convictions but vacate his prison term and remand the case for a new sentencing hearing.

## I.

### A.

From its founding on June 7, 1994, through September 11, 2000, Charles E. Edwards was the Chairman of the Board and sole owner of ETS Payphones, Inc. ("ETS"), a privately owned Georgia corporation that provided management services to payphone owners. Edwards also controlled Payphone Systems Acquisitions, Inc. ("PSA"), a Delaware corporation that was a wholly owned subsidiary of ETS. Edwards and others often referred to these two companies – and others Edwards formed to support ETS's payphone program – collectively as

---

[1] "Generically, a Ponzi scheme is a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." United States v. Silvestri, 409 F.3d 1311, 1317 n.6 (11th Cir. 2005) (quotation omitted).

ETS, and we do likewise.

Edwards organized ETS to implement his idea of selling coin-operated payphones to investors who would then lease the phones back to Edwards for a guaranteed rate of return. Edwards discussed his idea with an acquaintance, Beverly Slater, who suggested that he use insurance agents, those selling life insurance, including annuities, to market the payphones. Edwards liked her suggestion and persuaded her to establish a network of independent insurance agents to sell the phones. She would serve as the distributor of the phones, purchasing them from ETS and selling them to the investors solicited by the insurance agents. Slater formed BEE Communications, Inc. ("BEE") to perform the distributorship functions. Tom Murray was one of BEE's insurance agents. He was so successful selling payphones that Edwards made him a distributor. Like Slater, Murray formed a corporation to operate his distributorship, National Communications Marketing, Inc. ("NCMI").

Shortly after Edwards's sale and lease-back plan was up and running, Edwards formed PSA to deal with the distributors. The sale and lease-back of the payphones were handled as follows. The insurance agent, having found an investor, contacted the distributor, and the distributor sent the agent a five-year lease already executed by ETS, as lessee, for the investor to sign, as lessor. The

3

lease identified the location for the payphone the investor was purchasing, specified the rent ETS would be paying the investor each month,[2] spelled out ETS's responsibility for installing and servicing the phones, and contained a buy-back provision. The buy-back provision required ETS to purchase the payphone from the investor at the end of the lease for the same price the investor had paid for the phone. The provision also gave the investor the right to sell the payphone to ETS for that price at any time during the term of the five-year lease on 180 days notice to ETS.

If the investor agreed to this arrangement, the investor gave the insurance agent a check made out to the distributor for the price of the payphone. The agent then forwarded the check to the distributor, which deposited the check into its bank account. Once the investor's check cleared, the distributor deducted the sales commission, which was divided between it and the insurance agent,[3] and wire transferred the net sale proceeds to PSA's bank account. On a regular basis, PSA wired funds from its account to ETS for operating expenses, lease payments,

---

[2] The lease agreement gave the investor the option of participating with ETS in the servicing of the payphones, in which case the investor would receive some of the profits the phones yielded. This option played no role in the inducement of investors to participate in Edwards's sale and lease-back program.

[3] The commissions varied from time to time, ranging from a total of 20% in 1998 to 25% in 2000. The amounts the distributor and insurance agents received also varied, with the agents receiving approximately 75% of the total commission.

and buy-backs. PSA also wired funds to some 114 accounts designated by Edwards. Some of these accounts related to ETS's business, some were held by other business entities Edwards owned, and some accounts were held by Edwards for his and his wife's personal expenditures.

The price the investor paid for a payphone and the rent ETS remitted to the investor varied as Edwards's plan unfolded. In 1994, the payphones were sold for $4,770, and the monthly rental payment was $75. This gave the investor an 18.8% return on his investment. By 1999, the payphones were sold for $7,000, and the monthly rental payment was $82, for a return on investment of 14%.[4]

The insurance agents touted the ETS payphone program as a highly profitable alternative to investing in annuities or other forms of life insurance.[5] ETS provided the agents with promotional materials for distribution to prospective investors, primarily seniors, claiming that the payphone industry was "virtually recession-proof," that it was "primed for a successful and profitable future," and that "pay phone profits have grown dramatically and are expected to

---

[4] In 1996 and 1997, the phones sold for $5,000 and $6,000, respectively, and the monthly rental payment stayed at $75. Thus, the rate of return was 18% for 1996 and 15% for 1997.

[5] Investing in ETS's payphone program became extremely popular because it offered a significantly higher rate of return than annuities and other forms of investment and allowed the investor to cancel the lease prior to its expiration, triggering ETS's buy-back obligation without penalty.

continue to escalate." ETS's slogan was, "Opportunity doesn't always knock . . . sometimes it rings."

The revenues the payphones generated were insufficient to cover ETS's operating expenses, lease payments, and buy-back obligations. In short, Edwards's payphone business was never profitable. Because PSA paid its distributers and insurance agents commissions of up to 25% of the retail price of each phone sold,[6] and ETS was contractually obligated to buy back every phone for the full price paid by the investor, ETS immediately owed each investor more money than it collected on the sale of the phone – a deficit that could only be overcome by operating the phones at a substantial profit. The revenues the payphones provided, however, were extremely inadequate; by 2000, ETS was operating its phones at a loss of $5 million a month. Nearly 90% of the installed payphones were unprofitable. This problem was compounded by the fact that ETS leased more payphones from investors than it actually placed into service, a gap that increased from 150 in October 1996 to 17,960 by September 11, 2000.[7] ETS, therefore, always depended on the influx of money from new investors to sustain its payphone business. Moreover, if ETS suffered a "run on the bank" – a sudden

---

[6] ETS also gave its top agents ocean cruises and European vacations.

[7] ETS's senior management staff tracked this information and provided it to Edwards on a regular basis.

6

invocation of the lease's buy-back provision by a significant number of investors – the company would have collapsed. Whenever ETS's board of directors met,[8] ETS's mounting financial losses and the optimistic outlook ETS was portraying to the investors were discussed. According to Charles Bynum, ETS's Chief Operating Officer, Edwards attitude was that "we can't possibly let [investors] see what is really going on because if this money coming in from [new investors] ever stopped, the whole thing would crash." Edwards's attitude prevailed; the investors were kept in the dark.[9]

ETS's financial outlook appeared shaky from the outset. By 1996, the company had leased 750 payphones, but only 600 were in operation. Of the 600, at least 150 of the phones were not making enough money to cover the $70 monthly payment due the telephone company, let alone the additional operating expenses attributable to those phones, such as repairs, maintenance, and the cost of collecting the coin revenue. After conducting a comprehensive analysis of ETS's operational structure in October 1996, Bynum wrote in a memorandum to Edwards that ETS was not yet a "viable company" and that they were currently "in

---

[8] ETS's board consisted of Edwards and ETS senior staff members.

[9] One of the reasons why the investors were unaware of ETS's financial plight was the fact that ETS paid the lease payments due investors on time. ETS kept its payments current until it filed for bankruptcy in September 2000.

command of a near certain disaster." Edwards recognized this dire situation and acknowledged that ETS was "hemorrhaging" money. Bynum recommended shutting down the 150 unprofitable phones. Edwards rejected the recommendation. He told Bynum that if the investors found out that ETS was not operating a payphone for every lease, they would panic and demand their money back. Bynum also recommended that Edwards shut down the leasing side of the business and not bring on any more investors. Edwards rejected this recommendation as well and continued to recruit investors. He held weekly seminars for prospective investors – all identified by the distributors' insurance agents – at ETS's offices, where he would pitch ETS's sale and lease-back program as extremely profitable.[10] Bynum left ETS in January 1997. He was concerned about ETS's financial condition and the legality of what Edwards's was doing, concerns he conveyed to the FBI after leaving the company.

In the spring of 1998, ETS hired the Gross Collins accounting firm to

---

[10] For example, in April or May 1997, Edwards informed potential investor Ben Bolt that ETS was "rock solid" and that his investment would be extremely safe. Edwards went on to say that "God had really blessed" ETS and that Bolt had "nothing to worry about" because ETS would refund his investment within two weeks if he ever decided to sell his payphones. Having been thus assured, Bolt bought a total of 86 payphones. In August 1997, Edwards, in response to potential investor John Woodley's suggestion that ETS was operating a "Ponzi scheme," said that ETS's operations provided all the funds the company required and that an influx of money from new investors was not needed. Following this conversation, Woodley bought 15 payphones and later purchased 115 more.

perform an audit. In July, auditors Steve Gross and Derek Starnes met with

Edwards and presented him with a report of their preliminary findings. They told

Edwards that the revenue generated by the payphone operation was not sufficient

to cover the required monthly lease payments to the investors, that ETS had leased

far more payphones than it had placed in service, and that ETS did not have the

financial resources to fund its buy-back obligations. The auditors also told

Edwards that ETS's characterization of the monies generated through the

payphone sales as revenue painted an inaccurate picture of the company's

financial health.[11] When the auditors finished their presentation, Edwards threw

their report in the trash can and discharged their firm.

---

[11] Specifically, from the outset, Edwards had instructed that ETS classify the sale and lease-back program as an operating lease as opposed to a capital lease. An operating lease is essentially a rental situation where the lessor (owner) transfers the right to use the property to the lessee. At the end of the lease period, the lessee returns the property to the lessor. The lease payments are treated as a monthly operating expense and the balance sheet does not reflect the liability for future lease payments. In a capital lease, the lessee accounts for the asset as though it had actually purchased the asset (even if the lessor retains the title to the asset); that is, the balance sheet reflects the lessee's total future obligation under the lease. Based on Generally Accepted Accounting Principles ("GAAP"), the auditors informed Edwards that the sale and lease-back program was undoubtedly a capital lease – a conclusion affirmed by multiple ETS chief financial officers and a subsequent analysis of the lease classification by the accounting firm of Grant Thornton in 1999. As a result, the money that ETS/PSA received from the payphone sales could not properly be characterized as revenue; rather, it had to be characterized as debt because it eventually had to be paid back to the investors with interest in the form of lease payments. Although ETS was not legally obligated to use GAAP in compiling its financial reports for internal use, this accounting difference changed the appearance of ETS from a company that was losing millions of dollars a year to a company that was earning substantial profits.

9

On March 30, 2000, Edwards sent a memo to all ETS employees stating that "profits were below expectations in 1999" and that the company had entered into a period of "drastic times for the Payphone Industry." Edwards kept this information from ETS's distributors and their insurance agents. The agents, having no reason to question ETS's financial viability, therefore kept touting ETS's program as a sound investment. Edwards also continued to paint a rosy picture of ETS's profitability for investors. In May 2000, he gave a group of prospective investors a tour of ETS's offices. At the completion of the tour, he told them that ETS had sales of $28 million the previous year, netted $8 million in profit,[12] and planned to expand its business into Mexico and the Carribean.

By mid-2000, investors were cancelling their leases and triggering the buy-back provision at an increasing rate, causing significant cash flow problems for the company. Nevertheless, Edwards continued to woo investors with representations of ETS's prosperity. On July 1, 2000, he wrote his existing investors a letter stating that ETS was financially stable, "made a profit of nearly $8,700,000 last year and [that its] profit potential looks even brighter for this year." Additionally, when Edwards learned that some of the insurance agents were advising their

---

[12] As numerous ETS chief financial officers and outside auditors testified at trial, these non-GAAP numbers would drastically mislead investors as to the company's profitability.

investor clients to cancel their leases, he took steps to dissuade them. For instance, on July 5, 2000, he sent the following letter to Ron Bryant, one of BEE's agents, who had recommended that his clients request an early termination of their lease agreements:

> The ETS corporate family made a profit of over eight million dollars last year ($8,000,000+) and this year looks even better. . . . If you are telling a different story to our Lessors, you may be assured that ETS will not hesitate to take legal action against you to set the record straight in a public forum.[13]

Edwards echoed similar sentiments in a July 12, 2000, speech to dozens of BEE agents in Cartersville, Georgia, reassuring them that ETS was financially solid and that they should focus on selling more payphones.

At some point in the spring of 2000, Edwards hired a consultant, Ken Baker, to conduct a financial analysis of ETS and Twin Leaf Media – a company Edwards had formed to sell advertising spots on the payphone kiosks.[14] Edwards thought that the income Twin Leaf produced might alleviate ETS's financial problem. In July 2000, Baker informed Edwards that even if highly successful, Twin Leaf would not be able to solve the problem; ETS's sale and lease-back program was

---

[13] Edwards sent similar letters to BEE agents Scott Fountain and Phil Kerley on July 5 and 14, 2000, respectively, threatening legal action if they encouraged investors to cancel their leases.

[14] Many of the payphones ETS was leasing were situated in kiosks.

11

not sustainable. While continuing to sell more payphones would prolong the company's existence, eventually the number of new sales would not be sufficient to service the mounting debt, which Baker projected to reach $1.7 billion by 2004. In short, Baker told Edwards that it was only a matter of time until ETS would have to file for bankruptcy, and he recommended that ETS seek bankruptcy protection in October 2000.

Despite Ken Baker's grim projections, Edwards continued aggressively to market his company as financially sound. On July 29, he sent a letter to ETS's investors, stating that ETS continued to prosper and that he "personally believe[d] that this [was] without a doubt the best time to be in the payphone industry!" Shortly thereafter, on August 3, he wrote a follow-up letter to Ron Bryant, stating that "[t]here is no legitimate reason to advise any Lessor to liquidate his or her payphones." Three weeks later, Edwards hired two of his long-time investors, Bob and Alice Worsham, to contact other investors who had notified ETS that they were cancelling their leases and try to convince them to withdraw their notices.[15] He offered to pay the Worshams $100 for every phone that they convinced the investors to keep. As it turned out, they were able to persuade at

---

[15] As indicated in note 9, supra, ETS paid its investors all the rent they were due until it filed for bankruptcy.

least thirty-nine investors to stay with ETS.  In a final effort to generate additional revenue, Edwards sent a memorandum to BEE and NCMI on September 1, announcing a $350 rebate for anyone who purchased a payphone within thirty days.

On September 11, 2000, ETS and PSA filed petitions for Chapter 11 bankruptcy relief in the United States Bankruptcy Court for the District of Delaware.[16]  During the two months prior to filing these petitions, PSA, at Edwards's direction, continued to sell payphones, taking in $22 million from investors.[17]  The sales ceased after the petitions were filed.  As of September 11, ETS had 73,107 payphones under lease and was contractually obligated to buy back those phones at a total cost of $414,091,985.  Edwards's investors lost millions, but Edwards faired quite well.  He received more than $21 million from ETS and its subsidiaries in the form of salary, consulting fees, and interest free "loans" that he never repaid.  He used this money to purchase "[e]verything from expensive cowboy boots to million-dollar homes."

## B.

On June 8, 2004, a Northern District of Georgia grand jury indicted

---

[16]  The laws governing Chapter 11 proceedings are codified at 11 U.S.C. §§ 1101-74.

[17]  PSA continued to sell, and ETS continued to lease, payphones until a day or two before filing the petitions.

Edwards on fifty-seven counts of wire fraud, 18 U.S.C. § 1343, and twenty-five

counts of money laundering, 18 U.S.C. § 1957.[18]  A superceding indictment

---

[18]  The applicable statutory texts provide as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1343 (2000).

(a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

(b)(1) Except as provided in paragraph (2), the punishment for an offense under this section is a fine under title 18, United States Code, or imprisonment for not more than ten years or both.

(2) The court may impose an alternate fine to that imposable under paragraph (1) of not more than twice the amount of the criminally derived property involved in the transaction.
. . . .
(d) The circumstances referred to in subsection (a) are –
(1) that the offense under this section takes place in the United States . . . .
. . . .
(f) As used in this section –

(1) the term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of this title) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title . . . .

14

returned on August 10, 2004, added an additional count for conspiracy to commit

money laundering, 18 U.S.C. § 1956(h),[19] and a forfeiture provision.[20] In total,

Edwards was charged with eighty-three criminal offenses.

Edwards pled not guilty to all counts and elected to stand trial before a jury.

Prior to trial, he filed two motions in limine that are at issue in this appeal. The

first sought the exclusion of documents the Government obtained from the

Securities and Exchange Commission ("SEC") investigation on the theory that the

SEC and the United States Attorney's Office had conducted a joint and collusive

---

(2) the term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense; and

(3) the term "specified unlawful activity" has the meaning given that term in section 1956 of this title.

18 U.S.C. § 1957 (2000).

18 U.S.C. 1956(c)(7)(A) (2000) defines "specified unlawful activity" as "any act or activity constituting an offense listed in section 1961(1) of [title 18] except an act which is indictable under subchapter II of chapter 53 of title 31." A violation of section 1343 (relating to wire fraud) is listed as an offense in section 1961(1).

[19] 18 U.S.C. § 1956(h) (2000) provides that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

[20] 18 U.S.C. § 982(a)(1) provides that "[t]he court, in imposing sentence on a person convicted of an offense in violation of [18 U.S.C. §§ 1956 or 1957] shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."

investigation into Edwards's business operations.[21]  The second motion asked the

court to invoke the "sequestration rule" and exclude several Government

witnesses from the courtroom prior to their taking the witness stand.  The district

court denied both motions.

Edwards's trial began on September 12, 2005.  After the Government

presented its case in chief, Edwards moved the district court to enter a judgement

of acquittal on all counts pursuant to Rule 29(a) of the Federal Rules of Criminal

Procedure.[22]  The court denied the motion, and Edwards proceeded to put on a

defense.  After resting his case, Edwards renewed his Rule 29(a) motion.  The

court denied it.  The Government then presented its rebuttal, after which both sides

rested and the presentation of evidence closed.  At this point, Edwards did not

---

[21]  The history of this investigation and the subsequent legal proceedings are detailed in SEC v. ETS Payphones, Inc., 300 F.3d 1281 (11th Cir. 2002), rev'd, 540 U.S. 389, 124 S. Ct. 892, 157 L. Ed. 2d 813 (2004), and SEC v. ETS Payphones, Inc., 408 F.3d 727 (11th Cir. 2005).

[22]  Rule 29(a) states:

> Before Submission to the Jury.  After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.  The court may on its own consider whether the evidence is insufficient to sustain a conviction.  If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

Fed. R. Crim. P. 29(a).

16

renew his motion for acquittal, and the court submitted the case to the jury. The jury received the case in the afternoon of September 28 and returned its verdicts the next morning, finding Edwards guilty on all counts.

On February 23, 2006, the district court sentenced Edwards to one prison sentence of 156 months and ordered him to pay restitution to 10,662 investors in the amount of $320,397,837 and forfeit several properties that were involved in the offenses to the United States. This appeal followed.

Edwards presents six arguments; four relate to his convictions, two to his sentence. Regarding his convictions, he first seeks a judgment of acquittal on all counts on the ground that the district court erred in denying his motion for judgment of acquittal made after he rested his defense. Next, and alternatively, Edwards seeks a new trial on three grounds: (1) the district court denied him a fair trial and the ability to confront several prosecution witnesses, in violation of his Fifth and Sixth Amendment rights, when it refused to invoke the Federal Rule of Evidence 615 sequestration provision and permitted the witnesses to remain in the courtroom and listen to the testimony before they took the stand to testify; (2) the court erred in denying his motion to suppress certain documents he submitted to the SEC during its investigation of the ETS sale and lease-back program – documents the United States Attorney's Office later obtained for use in the

prosecution of this case; and (3) the court's jury instructions constructively amended the indictment.[23]

Edwards challenges his sentence on the grounds that (1) the court erred in calculating the amount of funds involved in the money laundering counts, and (2) the court's restitution order was entered in violation of his Sixth Amendment right to a jury determination of the elements of his offenses.

We consider first Edwards's arguments concerning his convictions.

## II.

## A.

Edwards contends that the district court erred in denying his motion for judgment of acquittal made after he rested his defense. As we note above, Edwards failed to renew his motion for judgment of acquittal at the close of all of the evidence as required by Rule 29; he therefore failed to preserve his right to challenge the sufficiency of the evidence.[24] Edwards argues that he properly preserved his objection by moving for a judgment of acquittal after resting his case. That is, he contends that this preserved his objection to the sufficiency of the

---

[23] Edwards also argues that the cumulative effect of these three errors denied him his due process right to a fair trial. As our discussion of his claims of trial error reveals, no error occurred. Consequently, he was not denied a fair trial.

[24] Edwards could have moved the district court for judgment of acquittal within seven days after the jury verdict, see Fed. R. Crim. P. 29(c), but he failed to do so.

evidence and that Rule 29(a) did not require him to renew his motion at the close of <u>all</u> the evidence. We disagree. The drafters of the Rule plainly contemplated that in the event, as here, the defendant put on a case and the prosecution presented rebuttal evidence, the district court would only be required to consider the sufficiency of the evidence if the defendant moved for a judgment of acquittal at "the close of all the evidence." See <u>United States v. Rigsby</u>, 943 F.2d 631, 643-44 (6th Cir. 1991).

Although Edwards failed to preserve his objection to the court's Rule 29(a) ruling, he is not foreclosed from having this court review the evidence that led to the jury's verdicts. If we find "a manifest miscarriage of justice – if the evidence on a key element of the offense is so tenuous that a conviction would be shocking" – we will set aside a conviction. <u>United States v. Bichsel</u>, 156 F.3d 1148, 1150 (11th Cir.1998) (quotation omitted). We turn, then, to the question of whether the arguments Edwards presents establish that a manifest miscarriage of justice would occur if we affirm the district court's judgment.

Edwards first argument addresses the wire fraud convictions. He questions whether the evidence established that he intended to defraud his investors; absent

19

such intent, the wire fraud convictions fail.[25]  We are satisfied that the jury had ample evidence of intent to defraud before it, and hence, Edwards's wire fraud convictions stand.

The jury learned that Edwards, with full knowledge that ETS was "hemorrhaging money" and unable to sustain its operations without a constant influx of investment capital, aggressively courted both new and existing investors with assurances that ETS was financially sound and profitable.  Indeed, less than seven weeks before seeking the bankruptcy court's protection under Chapter 11, Edwards sent a letter to investors proclaiming that ETS continued to prosper.  Moreover, he never disclosed to his investors that ETS would be unable to buy back the payphones, as required by its leases, if a substantial number of investors triggered the buy-back provision.  From this evidence alone, a rational jury could determine that Edwards intended to defraud his investors.  Given the other facts recited in part I.A, supra, we find that the Government presented more than sufficient evidence to make out the wire fraud offenses; thus, affirming Edwards's convictions for those offenses would not result in a miscarriage of justice.

Next, according to Edwards, his conviction for conspiracy to commit money

---

[25]  If the wire fraud convictions are vulnerable and must be set aside for lack of intent to defraud, Edwards submits that we must reverse his money laundering convictions since they depend on the validity of his wire fraud convictions.

laundering cannot stand because the Government failed to establish that he conspired with another person to launder money.[26] The Government's position at trial was that Edwards conspired with his wife, Evelyn Sue Edwards, and Joan Shepler, his assistant. After examining the trial transcript, however, we are left with an abiding impression that although Mrs. Edwards assisted her husband to "launder" some of the proceeds of payphone sales, frequently for her own benefit, the evidence failed to establish that she actually conspired with her husband to launder those proceeds – that she was aware that what he was doing was illegal. Whether Edwards was guilty of the conspiracy offense therefore turns on whether Shepler was implicated.

Criminal conspiracies, because they are inevitably secret, are rarely established by direct evidence. The cases accordingly turn on whether there is circumstantial evidence that two or more persons conspired to commit the criminal offense. See United States v. Mercer, 165 F.3d 1331, 1333 (11th Cir. 1999). The indictment alleged that Edwards and others conspired to use the proceeds from the sale of the payphones (the "fraud proceeds") (1) to conduct financial transactions

_____

[26] To convict Edwards on the money laundering conspiracy charge, the Government had to prove that (1) an agreement existed between two or more persons to violate 18 U.S.C. § 1956 or §1957 and (2) that Edwards knowingly and voluntarily participated in that agreement. United States v. Silvestri, 409 F.3d 1311, 1328 (11th Cir. 2005). Edwards asserts that the Government failed to provide sufficient evidence of the first element.

21

with the intent to promote the scheme to defraud; (2) to conduct financial transactions with the intent to conceal and disguise the source, location, ownership, nature, and control of the proceeds; and (3) to engage in monetary transactions in amounts greater than $10,000.

After careful examination of the record, we conclude that the Government proved that Joan Shepler knowingly acted as a coconspirator in the money laundering scheme. The evidence indicated that Shepler was an integral part of the senior management of ETS and PSA, regularly attending board meetings where the financial woes of the company were discussed and performing such high level tasks as interviewing potential chief financial officer candidates. Shepler served as the point person for all monies wired to ETS and PSA by its distributers, money that was then used to support the operations side of the business and maintain the appearance of viability that allowed the fraud to continue. Additionally, Shepler coordinated a series of complex wire transactions (many of which in excess of $10,000) that routed fraud proceeds from ETS and PSA through the 114 various bank accounts controlled by Edwards. Because an agreement may be proven by "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme," United States v. Silvestri, 409 F.3d 1311, 1328 (11th Cir. 2005) (quotation omitted), the jury had

sufficient evidence before it to find that Shepler conspired with Edwards to launder the fraud proceeds.

B.

Rule 615 of the Federal Rules of Evidence provides that witnesses may be excluded from the courtroom while a trial is ongoing so that they cannot hear the testimony of other witnesses.[27]  The reason for the rule is obvious – to prevent witnesses from "'tailoring' their testimony to that of earlier witnesses" and to "aid[] in detecting testimony that is less than candid."  Geders v. United States, 425 U.S. 80, 87, 96 S. Ct. 1330, 1335, 47 L. Ed. 2d 592 (1976).  Rule 615 recognizes an exception, however, for "a person authorized by statute to be present."  The Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, provides such an exception: the victim of a crime has "[t]he right not to be excluded from any . . . public court proceeding."  18 U.S.C. § 3771(a)(3).  The Act, though,

---

[27]  Rule 615 provides as follows:

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion.  This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by statute to be present.

Fed. R. Evid. 615.

23

authorizes the court to exclude a victim-witness if it finds by clear and convincing evidence that the witness's testimony "would be materially altered if the victim heard other testimony at that proceeding." Id.

Prior to the commencement of his trial, Edwards moved the district court to sequester all potential prosecution witnesses, including those witnesses who purported to be the victims in the case. Citing the CVRA, the court denied the motion as to the victim-witnesses. In his brief on appeal, Edwards argues that Rule 615 is constitutionally based and that the district court's invocation of the CVRA to deny his motion denied him his Fifth Amendment due process right to a fair trial and his Sixth Amendment right of confrontation.[28] This argument fails for one simple reason: A criminal defendant has no constitutional right to exclude witnesses from the courtroom. Mathis v. Wainwright, 351 F.2d 489, 489 (5th Cir. 1965);[29] Bell v. Duckworth, 861 F.2d 169, 170 (7th Cir. 1988). We accordingly hold that the district court committed no abuse of discretion in denying Edwards's motion.

---

[28] Edwards does not argue that he provided the district court with clear and convincing evidence of the likelihood that the victim-witnesses would materially alter their testimony if they were not sequestered. In fact, he concedes that the "degree to which these witnesses may have 'tailored' their testimony to each other is not discernable from the record." Appellant Br. at 57.

[29] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

C.

On September 29, 2000, eighteen days after ETS and PSA sought relief in the bankruptcy court, the SEC brought suit against ETS and Edwards in the United States District Court for the Northern District of Georgia, alleging that ETS's sale and lease-back of payphones constituted the fraudulent sale of unregistered securities in violation of federal securities laws and seeking injunctive relief.[30] During the course of the litigation, the court ordered Edwards to produce certain documents – Edwards's personal income tax returns for 1995 through 1999, an appraisal of certain investment property, and consolidated financial statements and accounting papers prepared by Gross Collins for ETS – and file them with the court under seal.[31] Edwards promptly complied with the court's order. The docket sheet for the case indicates that they are still under seal.

Edwards anticipated that the Government might attempt to use copies of these documents in prosecuting the instant case and moved to suppress such

[30] See supra note 21.

[31] The district court described these documents in its March 24, 2005, order denying Edwards's motion to suppress the documents in the instant case. In his motion, Edwards represented that he had produced the documents as part of settlement negotiations he was having with the SEC.

25

duplicates.[32]  Edwards represented that the SEC filed suit against him for the

purpose of acquiring evidence for the United States Attorney's use in the instant

prosecution, and had the SEC informed him that it had filed suit for that purpose,

he would not have produced the documents.  Such a tactic, he argued, smacked of

collusion and infringed his right under the Fifth Amendment's Due Process Clause

and the Amendment's protection against self-incrimination.[33]  The court denied his

motion in an order entered on March 24, 2005.

Edwards argues that the documents should have been suppressed because

"the SEC provided these documents in bad faith to the United States Attorney to

facilitate [his] criminal prosecution . . .  after the [SEC, ETS and Edwards] reached

---

[32]  In his brief  to this court, Edwards represents that his motion to suppress included a "lengthy declaration" he submitted to the district court on October 11, 2000, in opposition to the SEC's motion for a preliminary injunction.  In reading Edwards's motion to suppress, we find no mention of the declaration.  Nor does the district court, in its March 24, 2005 order mention this document.  Edwards's brief acknowledges such lack of explicit reference to the declaration and suggests that we should still consider it because a fair reading of his motion to suppress indicates that the motion was referring to any evidence the United States Attorney acquired from the SEC.
    At trial, the prosecutor used Edwards's declaration to impeach Edwards while he was testifying in his own defense.  His attorney objected to such use.  The objection, which was based on the court's instruction as to the manner in which exhibits were to be identified, was meritless.

[33]  Edwards's motion to suppress did not cite these Fifth Amendment provisions as the bases for relief.  Those citations appear for the first time in his brief on appeal.  Appellant Br. at 66.  The motion stated that the duplicate documents should be suppressed for this reason:
    Any evidence that the Government received from the SEC from SEC settlement negotiations or proceedings, including those filed by [the district court] under seal should be excluded from presentation by the Government, as this evidence was obtained by the Government in bad faith and contrary to this Court's precedent.

26

an impasse with respect to the settlement of the SEC case."[34]  The court found no

merit in Edwards's motion to suppress because Edwards had presented

> no evidence of bad faith by the government with respect to the documents
> [at issue].  The tax returns . . . were readily accessible by the government
> from the beginning of this case, without regard to the [sealing] order in the
> SEC case.  The other documents . . . were produced pursuant to a grand jury
> subpoena. [Edwards] has not contested the fact that all the documents would
> have been obtainable (or were obtained) by the government independent of .
> . . the sealing order in the SEC case.  There is simply no evidence here of
> any bad faith or improper exploitation of the SEC case by the United States
> Attorney for the purpose of developing its criminal prosecution.

We find no error in the district court's ruling.  The SEC is authorized by

statute, 15 U.S.C. §§ 77t(b), 78u(d),[35] to provide evidence of misconduct to the

Department of Justice.  Moreover, there is nothing in this record that suggests,

much less establishes, that the SEC and the United States Attorney somehow

---

[34]  The quoted language, taken from the district court's March 24 order, expresses Edwards's reason for suppressing the documents.

[35]  15 U.S.C. § 77t(b) provides that the SEC "may transmit such evidence as may be available concerning such acts or practices [that constitute a violation of the law] to the Attorney General who may, in his discretion, institute the necessary criminal proceedings."  15 U.S.C. § 78u(d)(1) provides that the SEC "may transmit such evidence as may be available concerning such acts or practices as may constitute a violation of any provision of this chapter or the rules or regulations thereunder to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings."

colluded to deny Edwards his constitutional rights.[36]

## D.

As his final challenge to his convictions, Edwards contends that the district court constructively amended the indictment in its instruction to the jury as to the definition of a "Ponzi scheme." The amendment, he submits, allowed the jury to convict him of wire fraud without finding that he acted with the intent to defraud.

"A jury instruction that constructively amends a grand jury indictment constitutes per se reversible error because such an instruction violates a defendant's [Fifth Amendment] right to be tried on only those charges presented in a grand jury indictment." United States v. Cancelliere, 69 F.3d 1116, 1121 (11th Cir. 1995). A constructive "amendment occurs when the essential elements of the offense . . . are altered to broaden the possible bases for conviction beyond what is contained in the indictment." United States v. Keller, 916 F.2d 628, 634 (11th Cir. 1990). To determine whether error has occurred, we consider the court's

_____

[36] In support of his argument that the district court erred, Edwards primarily relies on two district court decisions, United States v. Scrushy, 366 F. Supp. 2d 1134 (N.D. Ala. 2005), and United States v. Stringer, 408 F. Supp. 2d 1083 (D. Ore. 2006), overruled by United States v. Stringer, No. 06-30100, 2008 WL 901563 (9th Cir. Apr. 4, 2008). In Scrushy, the district court suppressed the introduction of the defendant's SEC deposition at his criminal trial and dismissed the perjury counts predicated on that testimony. 366 F. Supp. 2d at 1138-40. In Stringer, the district court dismissed the defendants' securities fraud indictments because the United States Attorney had used the guise of an SEC investigation to conceal its interest in prosecuting the defendants. 408 F. Supp. 2d at 1085-86, 90. Both of these cases are distinguishable as their holdings rest on a showing of prosecutorial misconduct.

instructions as a whole, reading them in light of the trial transcript. See United States v. Deleveaux, 205 F.3d 1292, 1296 (11th Cir. 2000); United States v. Artrip, 942 F.2d 1568, 1570 (11th Cir. 1991).

Conviction under the wire fraud statute requires that the defendant (1) intentionally participated in a scheme or artifice to defraud another person of money or property and (2) used or caused the use of interstate wires to execute the scheme or artifice. United States v. Ward, 486 F.3d 1212, 1222 (11th Cir. 2007). The first essential element of the offense, mens rea, was spelled out in the indictment thusly:

> Edwards did knowingly and willfully devise and intend to devise a scheme and artifice to defraud investors through the sale of coin-operated payphones and to obtain money from those investors by means of false and fraudulent pretenses and representations, and by omissions of material facts, well knowing and having reason to know that such pretenses and representations were and would be false and fraudulent when made and caused to be made and that said omissions were and would be material.

We now turn to the jury instruction at issue to determine whether it amended the indictment by effectively eliminating the mens rea element from the wire fraud offense. Referring to Counts One through Fifty-seven, the court informed the jury as follows:

> Title 18, United States Code, Section 1343 makes it a federal crime or offense for anyone to use interstate wire communications facilities in

29

carrying out a scheme to defraud. The defendant can be found guilty of that offense only if all of the following facts are proved beyond a reasonable doubt. First, that the defendant knowingly devised or participated in a scheme to defraud or for obtaining money or property by means of false pretenses, representations, or promises. Second, that the false pretenses, representations, or promises related to a material fact. Third, that the defendant did so willfully and with the intent to defraud and, fourth, that the defendant transmitted or caused to be transmitted by wire in interstate commerce some communication for the purpose of executing the scheme to defraud.

The court then went on to expound upon the meaning of several key terms to help the jury better understand the elements of the wire fraud offense, beginning with "scheme to defraud":

The term scheme to defraud includes any plan or course of action intended to deceive or cheat someone out of money or property by means of false or fraudulent pretenses, representations, or promises.

Now, in this case the government alleges that the defendant operated a Ponzi scheme which defrauded investors. A Ponzi scheme is a fraudulent investment scheme in which "profits" to investors[] are not created by the success of the underlying business venture, but instead are derived fraudulently from capital contributions of other investors. In a typical Ponzi scheme a corporation operates and continue[s] to operate at a loss. The corporation gives the appearance of being profitable by obtaining new investors and using those investors to pay for the high returns promised to earlier investors.

The effect of such a scheme is to put the corporation further and further into debt by incurring more and more liability, but to give the false appearance of profitability in order to obtain new investors.

Edwards argues that by defining a Ponzi scheme, the court constructively expanded the indictment by removing the element of criminal intent and allowing

30

the jury to infer intent if it found that the ETS sale and lease-back program was a Ponzi scheme. We disagree. To begin, the opening paragraph of the jury instruction clearly states that Edwards could only be found guilty if he possessed the "intent to defraud." What Edwards cites as offending language did not speak to the element of intent at all. Rather, the discussion of a Ponzi scheme merely served to define the particular type of "scheme to defraud" that Edwards was alleged to have perpetrated. Moreover, the court went on to reemphasize the <u>mens rea</u> requirement in defining what it meant to "act with an intent to defraud":

> Now, to act with "intent to defraud" means to act knowingly and with the specific intent to deceive or cheat someone, ordinarily for the purpose of causing some financial loss to another or bringing about financial gain to one's self. . . . What must be proved beyond a reasonable doubt is that the defendant, with the intent to defraud, knowingly and willfully devised, intended to devise, or participated in a scheme to defraud substantially the same as the one alleged in the indictment . . . .

As the jury instructions did not alter the <u>mens rea</u> element of the wire fraud offense, a constructive amendment did not occur.

## III.

We do not reach Edwards's challenges to his sentence because, with the exception of the district court's restitution order,[37] we must vacate his sentence

---

[37] The district court entered a forfeiture order as part of Edwards's sentence. He does not challenge that order in this appeal. It therefore remains intact.

31

and remand the case for a new sentencing hearing. Although Edwards was convicted on fifty-seven counts of wire fraud, twenty-five counts of money laundering, and one count of conspiracy to commit money laundering, he received only one sentence – a prison term of 156 months. The only single offense for which he could have received a prison term of that length is the conspiracy to launder money offense.[38] The maximum incarceration penalty for that offense is twenty years' imprisonment. 18 U.S.C. § 1956 (2000). The maximum incarceration penalty for money laundering is ten years, and for wire fraud five years.[39] 18 U.S.C. § 1957 (2000); 18 U.S.C. § 1343 (2000). On remand, the court must impose a sentence for each count of conviction.[40]

Edwards challenges the restitution order on the ground that United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 631 (2005), requires that the factual predicate for restitution be found by the jury beyond a reasonable doubt (unless trial by jury is waived or the defendant admits to the predicate). Edwards

---

[38] There is nothing in the transcript of the sentencing hearing indicating that the court imposed the 156 month prison term for the conspiracy offense.

[39] The presentence investigation report states that the maximum incarceration penalty for wire fraud is twenty years' imprisonment. The twenty-year term was provided by a 2002 amendment to the statute. Act of July 30, 2002, Pub. L. 107-204, Title IX, § 903(b), 116 Stat. 745, 805. The term in effect at the time Edwards committed the wire fraud offenses was five years (thirty years if the violation affected a financial institution). 18 U.S.C. § 1343 (2000)

[40] We of course intimate no view as to the sentences that would be appropriate.

32

acknowledges in his brief, however, that his challenge is foreclosed by a prior decision of this court, United States v. Williams, 445 F.3d 1302 (11th Cir. 2006), abrogated on other grounds by United States v. Lewis, 492 F.3d 1219 (11th Cir. 2007).

## IV.

For the foregoing reasons, we AFFIRM Edwards's convictions, VACATE Edwards's sentence, with the exception of the restitution and forfeiture orders, and REMAND the case for a new sentencing hearing.

SO ORDERED.